**HELMER • FRIEDMAN, LLP**
Gregory D. Helmer, P.C. (S.B. #150184)
    (ghelmer@helmerfriedman.com)
Andrew H. Friedman, P.C. (S.B. #153166)
    (afriedman@helmerfriedman.com)
Kenneth A. Helmer (S.B. # 193366)
    (khelmer@helmerfriedman.com)
William O. Kampf (S.B. #217854)
    (wkampf@helmerfriedman.com)
8522 National Blvd., Suite 107
Culver City, California 90232
Telephone: (310) 396-7714
Facsimile: (310) 396-9215

Attorneys for Plaintiff
DANIELLE MAILHOIT

# UNITED STATES DISTRICT COURT

## FOR THE

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE MAILHOIT, | ) Case No. CV11-03892-DOC (SSx) |
| Plaintiff, | ) [*Honorable Judge David O. Carter*] |
| v. | ) **PLAINTIFF DANIELLE** |
| HOME DEPOT U.S.A., INC., a corporation, THE HOME DEPOT, U.S.A., INC., a corporation, and DOES 2 through 50, inclusive, | ) **MAILHOIT'S MOTION IN LIMINE NO. 7 TO EXCLUDE TESTIMONY OF MICHAEL P. WARD, PH.D. RELATED TO PLAINTIFF'S MITIGATION EFFORTS; DECLARATION OF WILLIAM O. KAMPF IN SUPPORT THEREOF** |
| Defendants. | ) Hearing Date:  February 4, 2013 |
| | ) Time:          8:30 a.m. |
| | ) Courtroom:     9D, Santa Ana |
| | ) Complaint filed: March 30, 2011 |
| | ) Disc. Cutoff:    August 31, 2012 |
| | ) Pretrial Conf.:  February 4, 2013 |
| | ) Trial Date:     February 19. 2013 |

TO DEFENDANT THE HOME DEPOT, U.S.A., INC. AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 4, 2013, at 8:30 a.m. or as soon thereafter as counsel may be heard in Courtroom 9D of the above-entitled court, located at 411 West Fourth Street, Room 1053 Santa Ana, CA 92701-4516, Plaintiff Danielle Mailhoit ("Plaintiff") will move in limine for an order precluding the testimony of Defendant's expert witness, Michael P. Ward, Ph.D., from offering testimony/opinion regarding Plaintiff's efforts to mitigate her damages in this matter.

The motion will be made on the ground that Michael P. Ward, Ph.D.'s purported opinions must be excluded because they are not presented as appropriate rebuttal expert opinions in that Plaintiff did not designate an expert on the subject of her mitigation efforts. Moreover, the testimony and opinion: (1) is outside the area of expertise of the expert; (2) creates a burden of proof on Plaintiff that does not exist; and (3) does not concern a subject sufficiently beyond common experience so as to assist the trier of fact. These opinions also must be excluded pursuant to Federal Rule of Evidence 403 because the probative value of such testimony is substantially outweighed by the danger of undue prejudice, and such testimony will confuse the issues and mislead the jury.

This motion is based upon this notice, the attached Memorandum of Points and Authorities, the pleadings, Kampf Declaration, records and files in this action, and any oral and documentary evidence as may be presented at the hearing on this motion.[1]

DATED:     January 8, 2013                 HELMER • FRIEDMAN, LLP

                                            William O. Kampf
                                            Attorneys for Plaintiff
                                            DANIELLE MAILHOIT

---

[1]      Counsel for Plaintiff met and conferred with counsel for Defendant regarding this motion in limine. Decl. of William O. Kampf ("Kampf Decl.) at ¶ 3.

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      RELEVANT FACTS

Defendant intends to have Michael P. Ward, Ph.D. ("Dr. Ward"), an economist, testify about Plaintiff's job search efforts, how long she should have been out of work, and jobs available for her to submit applications for employment. This evidence should be excluded for numerous reasons. First, Dr. Ward was not properly designated to testify or opine on Ms. Mailhoit's efforts to mitigate her damages. Instead, he is designated as a Rebuttal Expert, and as such, his testimony and opinions are limited to rebutting the testimony and opinions of Ms. Mailhoit's properly designated experts, none of whom opined or provided testimony related to vocational and/or mitigation efforts.

Second, Dr. Ward is not a vocational expert and thus, even if he was properly designated by Defendant, he is not qualified to testify about mitigation efforts. Third, Dr. Ward's opinion is improper and inappropriately places the burden of proof on Plaintiff, rather than Defendant, regarding what is necessary to establish that Plaintiff has not mitigated her damages. Dr. Ward's opinion also is not expert in nature, but rather a lay opinion, as he did no analysis of Ms. Mailhoit's actual job search efforts. Finally, because Dr. Ward's testimony is a lay opinion, it would be prejudicial for Dr. Ward to testify at trial or offer evidence regarding Dr. Ward's opinions pursuant to Federal Rule of Evidence 403.

Thus, any testimony and opinion by Dr. Ward or any other expert designated by Defendant regarding Ms. Mailhoit's mitigation efforts must be excluded.

### II.     FACTUAL AND LEGAL ARGUMENT

#### A.      Rebuttal Expert Michael P. Ward, Ph.D.'s Opinions on Vocational Issues Should Be Excluded Because They Went Beyond Rebuttal to Plaintiff's Economics Expert

Under FRCP Rule 26's expert disclosure mechanism, "a party may designate additional experts after initial expert disclosures, with one caveat: the additional

1  experts' testimony is limited to rebutting or contradicting the expert testimony
2  initially designated by the opposing party." *International Business Machines Corp.*
3  *v. Fasco Industries, Inc.*, 1995 WL 115421 (N.D. Cal. 1995). As succinctly
4  summarized by Judge Aguilar in *International Business Machines Corp.*:

5       The supplemental or "rebuttal" experts cannot put forth their own
6       theories; they must restrict their testimony to attacking the theories
7       offered by the adversary's experts. In this respect, a party can control
8       the scope of the testimony of its adversary's rebuttal experts by
9       limiting its own experts' testimony to a given subject matter. ***A party***
10       ***who forgoes designating experts on the initial disclosure date will***
11       ***thus find itself in a purely reactive mode, greatly restricted in its***
12       ***ability to offer expert testimony***.

13  Id. at *3 (emphasis added).

14       In this matter, Defendant did not make any Initial Expert Disclosures. *See*
15  Kampf Decl. at ¶ 10. Instead, Defendant specifically disclosed expert witness Dr.
16  Ward as a Rebuttal Expert to Plaintiff's designated experts. Kampf Decl. at ¶¶ 6, 10-
17  11, Ex. 3. Thus, Dr. Ward's opinions may be utilized only to ***rebut*** the expert
18  opinions of Plaintiff's economics expert Robert Taylor.

19       Here, however, Dr. Ward went beyond rebuttal of Mr. Taylor's opinions by
20  offering opinions regarding vocational/mitigation issues. For instance, in Paragraphs
21  16 through 27, and Paragraph 29 of his Report, Dr. Ward discusses at length Ms.
22  Mailhoit's job search history (including submission of job applications), purported
23  job openings since Ms. Mailhoit's termination in May 2010, and purported job
24  availability in Southern California. *See* Statement of Qualifications and Response to
25  Robert Taylor Report ("Ward Report") at §§ 16-27, 29.[2]

26

27

28       [2]     All documents and deposition transcript excerpts are attached to the
concurrently filed Kampf Decl.

1    These mitigation/vocational issues simply are not in rebuttal of Mr. Taylor's

2   opinions because Mr. Taylor does not purport to be an expert on vocational issues;

3   as a result, he offered no opinions on vocational matters/mitigation efforts

4   whatsoever. *See generally*, Taylor Report; Deposition of Robert Taylor ("Taylor

5   Dep.") 42:21-44:13; 93:3-95:4; 181:6-183:14; 203:2-207:17. Even Dr. Ward

6   testified that Mr. Taylor did not opine on Ms. Mailhoit's mitigation efforts.

7   Deposition of Michael P. Ward, Ph.D. ("Ward Dep.") 29:16-23.

8    Mr. Taylor did not opine on Plaintiff's mitigation efforts because it is not

9   Plaintiff's burden at trial to prove that she made any mitigation efforts. In fact, it is

10  quite the opposite. As explained in the Judicial Council of California Civil Jury

11  Instructions ("CACI") No. 2407, the burden for demonstrating that a plaintiff failed

12  to mitigate her damages is on Defendant:

13   **2407. Breach of Employment Contract - Unspecified Term –**

14   **Employee's Duty to Mitigate Damages**

15   [Name of defendant] claims that if [name of plaintiff] is entitled to any

16   damages, they should be reduced by the amount that [he/ she] could

17   have earned from other employment. To succeed, [name of defendant]

18   must prove all of the following:

19   1.    That employment substantially similar to [name of plaintiff]'s

20         former job was available to [him/her];

21   2.    That [name of plaintiff] failed to make reasonable efforts to seek

22         [and retain] such employment; and

23   3.    The amount that [name of plaintiff] could have earned from such

24         employment.

25  CACI No. 2407 (in pertinent part); *see also Chyten v. Lawrence & Howell*

26  *Investments*, 23 Cal. App. 4th 607, 616, 46 Cal. Rptr. 2d 459 (1993) ("The burden is

27  on the employer to prove that substantially similar employment was available which

28  the wrongfully discharged employee could have obtained with reasonable effort"). If

Defendant wished for Dr. Ward to offer opinion testimony regarding Ms. Mailhoit's efforts to mitigate her damages, Defendant should have designated Dr. Ward as an expert prior to the Opening Expert Disclosures deadline of November 20, 2012. Defendant did not. Defendant cannot now circumvent its obligation to designate Dr. Ward as an expert by offering opinion testimony as a Rebuttal Expert that does not rebut any opinion of Ms. Mailhoit's properly designated expert. Therefore, while Dr. Ward's opinions on economic issues which purportedly rebut Mr. Taylor's conclusions are proper, Dr. Ward's opinions on vocational/mitigation issues are not. Thus, Dr. Ward's opinions should be limited to those which rebut Mr. Taylor's economics analysis and his opinions on vocational matters must be barred. Fed. Rule Civ. Proc. 26(a)(2)(D).

**B.     Dr. Ward Is an Economist, Not a Vocational Analysis Expert**

Even assuming, *arguendo*, that Dr. Ward's opinions are somehow deemed to be a rebuttal to Plaintiff's designated expert (which they are not), Dr. Ward's own testimony confirms that he is not qualified to assess Ms. Mailhoit's mitigation efforts. This Court must "make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Elsayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (quotation and citation omitted).

Dr. Ward testified that he is not and has never been qualified as a vocational employment expert or a career placement expert; and no one in his office is an expert in these categories. Ward Dep. 50:17-51:12. In fact, his resume contains no mention of any experience in fields relating to hiring and career development or vocation analysis. Ward Report at Ex. 1. Dr. Ward has not published any papers since 1993 and none of the papers listed on his resume deal with vocational analysis. *See* Ward Report at Ex. 1. Rather, the papers deal with economic behavior of employers or employees, many of which deal with gender related issues, population growth, and social security. Ward Report at Ex. 1. The seminars/presentations listed are on the

same subjects and many appear to be presentations of the papers listed in the publications section.  Ward Report at Ex. 1.

Simply put, Dr. Ward is a "labor economist."  Ward Dep. 45:9-15.  He was retained for economics and statistics.  Ward Dep. 27:20-28:5.  Is Dr. Ward qualified to testify about economics – Yes.  Does he have the background and experience to testify about the vocational mitigation efforts of Ms. Mailhoit – No.

## C.   Dr. Ward's Testimony on Ms. Mailhoit's Mitigation Efforts Is Improper and Misleading

Dr. Ward's opinion on Ms. Mailhoit's job search efforts, how long she should have been out of work, and job availability is simply improper under the current legal standard.  In a retaliation/wrongful termination case, "[t]he burden is on the employer to prove that substantially similar employment was available which the wrongfully discharged employee could have obtained with reasonable effort." *Chyten*, 23 Cal. App. 4th at 616 ("The rule placing this burden of proof on the employer is old and firmly established").  The ***employer*** "must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages." *Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal.3d 176, 181-182, 89 Cal. Rptr. 737 (1970).  As stated in CACI No. 2407: In deciding whether the employment was substantially similar, the jury should consider, among other factors, whether:

(a)   The nature of the work was different from Ms. Mailhoit's employment with Defendant;

(b)   The new position was substantially inferior to Ms. Mailhoit's former position;

(c)   The salary, benefits, and hours of the job were similar to Ms. Mailhoit's former job;

PLAINTIFF'S MOTION IN LIMINE NO. 7

(d)    The new position required similar skills, background, and experience;

(e)    The job responsibilities were similar; and

(f)    The job was in the same locality.

CACI No. 2407 (citing *Parker*, 3 Cal.3d at 181-182).

In the present matter, Dr. Ward confirmed that there was no analysis of the list of possible jobs identified in his Report to determine if they were substantially similar to Ms. Mailhoit's job when she was fired; it was only a review to see if the jobs met Ms. Mailhoit's skill set.  Ward Dep. 53:5-60:4, 83:13-90:8, 246:9-247:2. Specifically, neither he nor his staff made any attempt to determine: (1) if the nature of the work was different from Ms. Mailhoit's employment with Defendant; (2) whether the position was substantially inferior to Ms. Mailhoit's former position; (3) whether the salary, benefits, and hours of the job were similar to Ms. Mailhoit's former job; or (4) if the new position required similar skills, background, and experience.  Ward Dep. 83:13-90:8, 235:15-239:19, 246:9-247:2.  Moreover, Dr. Ward assumed that Ms. Mailhoit would be willing to relocate for a Store Manager position within the same area that she testified that she would relocate for a District Manager position; thus he did not determine which positions were in the same locality.  Ward Dep. 90:9-104:13.  In fact, most of the job openings were not in the same locality.  Ward Dep. 103:12-17.

Without being able to testify that these jobs were substantially similar, any testimony about when Ms. Mailhoit should have gone back to work or her job search efforts, as represented by Dr. Ward, is improper.  Again, Defendant must show that the job openings were substantially similar.  But Dr. Ward's own testimony shows that there was no analysis to determine if the job openings met this burden. Allowing Dr. Ward's opinion is improper, it would severely prejudice the Plaintiff in the eyes of the jury by confusing the issues, and it is misleading on the law.  This testimony changes the burden of proof to say that the employer only has to show that

6

there were jobs available that an employee did not pursue.  This is not the type of opinion that can be attacked through cross examination.  This does not go to the veracity, credibility, or believability of the testimony.  Rather, it goes to the very heart of the testimony and opinion itself and is impermissible.

### D.   Dr. Ward's Testimony On Mitigation is Nothing More Than a Lay Opinion; It Provides No Expert Analysis and Thus is Improper

Rule 702 of the Federal Rules of Evidence allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  But here, Dr. Ward's testimony is not of an expert type.  It is a lay opinion.

Dr. Ward's opinion on Ms. Mailhoit's job search is that she conducted a minimal job search.  Ward Report ¶¶ 18-20.  In analyzing Dr. Ward's Report, however, this is essentially how Dr. Ward arrived at his opinion:

1.   He added up the number of jobs Plaintiff identified as applying to during a 13-month time period (Ward Dep. 217:16-220:25);

2.   He added up the number of jobs that he and his staff felt were comparable and available on an internet job search website (Ward Dep. 53:5-54:5); and

3.   He concluded that therefore Ms. Mailhoit did a minimal job search. Ward Report at ¶¶ 21-26.

As illustrated above, Dr. Ward did no analysis to determine if the jobs he and his staff found were substantially similar.  In total, there is no expert analysis of opinion being offered.  This is a lay opinion that the jury could reach as all this evidence is before them.  Even Dr. Ward conceded that there is no formal education or certification required to search for open positions on job-related internet websites for the type of positions he listed in his Report.  Ward Dep. 53:5-60:4, 78:14-80:23. Therefore, the subject matter of Dr. Ward's testimony is not so far removed from

common experience that his opinions would be helpful to the jury.  Fed. Rule of Evid. 702(a).

### E.    The Unduly Prejudicial Nature of the Proposed Testimony Far Outweighs Its Purported Benefit

Federal Rule of Evidence 403 allows exclusion of evidence that is unduly prejudicial:

> "[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The policy underlying FRE 403 to exclude expert evidence when the risk it presents of prejudice, confusion, and diversion of attention exceeds its potential helpfulness to the finder of fact.  The Supreme Court has recognized the substantial danger that juries will accord excessive weight to expert testimony simply because it is labeled "expert:"

> Throughout, a judge assessing a proffer of expert scientific testimony...should also be mindful of other applicable rules. ...  Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...."  Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786 (1993); *see also Rogers v. Raymark Industries, Inc.*, 922 F.2d 1426, 1429 (9th Cir.

1991) (trial court should not routinely admit expert opinion testimony without carefully weighing testimony's probative value against possible prejudicial effect).

The probative value of Dr. Ward's testimony is minimal at best in light of the fact that he admits that he did not properly research any of the job postings in detail. The danger of unfair prejudice, however, is particularly acute here, where the testimony focuses on the very same factual issues that the jury must resolve. The risk is that the jury will view Dr. Ward's perception of the facts, for which he is a paid advocate and of which he has no first-hand knowledge, as somehow more reliable than their own personal view of the facts merely because of his "expert" label. This is exactly the type of testimony that Federal Rule of Evidence 403 is designed to prevent.

Dr. Ward's opinions are intended to substitute for the jury's own decision making based on facts to be presented. An expert's opinion is often given greater weight by a jury. *Elsayed Mukhtar*, 299 F.3d at pp. 1063-1064 (recognizing "the aura of authority experts often exude, which can lead juries to give more weight to their testimony"). To allow Dr. Ward to invade the province of the jury and to substitute his opinions for theirs would substantially prejudice Ms. Mailhoit's case.

## III. CONCLUSION

For the foregoing reasons, Ms. Mailhoit respectfully requests that the Court issue an order in limine precluding Defendant, its witnesses, and its attorneys from mentioning, referring to, attempting to prove, submitting or attempting to submit evidence or argument from Dr. Ward or any other expert that Ms. Mailhoit did not properly mitigate her damages, did not engage in a proper job search, or any related mitigation/vocational issues.

DATED:        January 8, 2013                 HELMER • FRIEDMAN, LLP

William O. Kampf
Attorneys for Plaintiff
DANIELLE MAILHOIT

9

## DECLARATION OF WILLIAM O. KAMPF

I, William O. Kampf, declare:

1.      I am a senior attorney at Helmer Friedman, LLP, counsel of record for Plaintiff Danielle Mailhoit in this matter entitled *Danielle Mailhout v. Home Depot U.S.A. Inc. et al* (Case No. CV11-03892–DOC (SSx)).  I am making this declaration in support of Plaintiff's Motion in Limine No. 7 to Exclude Testimony of Michael P. Ward, Ph.D. Related to Plaintiff's Mitigation Efforts.

2.      As a result of my direct involvement in the matters set forth below, I have personal and firsthand knowledge of the facts set forth in this declaration, and I could and would testify competently to such facts if called as a witness.

3.      On November 20, 2012, my office served Plaintiff Danielle Mailhoit's Expert Witness Disclosures, pursuant to Federal Rule of Civil Procedure 26 ("Plaintiff's Initial Expert Disclosures").

4.      As part of Plaintiff's Initial Disclosures, Plaintiff designated Robert A. Taylor, CPA/ABV.  Attached as Exhibit 1 is a true and correct copy of Mr. Taylor's Report that was included with Plaintiff's Initial Expert Disclosures.

5.      On December 12, 2012, Elizabeth A. Falcone of Ogletree, Deakins, Nash, Smoak & Steward, P.C., counsel for Defendants, conducted the deposition of Mr. Taylor.  Greg D. Helmer of Helmer Friedman, LLP defended Mr. Taylor's deposition.  Attached hereto as Exhibit "2" are true and correct copies of excerpts from Mr. Taylor's deposition that are cited in support of Plaintiff's motion in limine.

6.      On or about December 18, 2012, Defendants' served their Rebuttal Expert Witness Disclosures.  Attached hereto as Exhibit 3 is a true and correct copy of Defendant's Rebuttal Witness Disclosures, which contains Michael P. Ward, Ph.D.'s Statement of Qualifications and Response to Robert Taylor as Exhibit "B."

7.      Greg D. Helmer also took the deposition of Michael P. Ward, Ph.D. on January 7, 2013.  A formal deposition transcript has yet to be made available.  However, the court reporter provided a "rough" version of the transcript.  Attached hereto as Exhibit "4" are true and correct copies of excerpts from Dr. Ward's "rough" deposition transcript that are cited in support of Plaintiff's motion in limine.

8.      As soon as Dr. Ward's formal, official deposition becomes available, Plaintiff shall provide copies of the cited excerpts to the Court.

9.      On January 7, 2013, following the deposition of Dr. Ward, I sent an email to Ms. Falcone in an attempt to meet and confer to determine if Defendants would agree to exclude the testimony of Dr. Ward regarding Plaintiff's mitigation efforts, explaining the basis for Plaintiff's Motion.  As of the time of filing this Motion in Limine No. 7, Ms. Falcone has not responded.

10.     In this matter, pursuant to the Parties' Stipulation and the Court's Order of June 5, 2012, Opening Expert Witness Disclosures were due no later than November 20, 2012 and Rebuttal Expert Witness Disclosures were due no later than December 18, 2012.

11.     Defendant did not make any Opening Expert Witness Disclosures.  Instead, Defendant specifically disclosed expert witness Dr. Ward as a Rebuttal Expert on December 18, 2012.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

This declaration was executed on January 8, 2013 at Culver City, California.

William O. Kampf

11

# EXHIBIT 1

Report of Robert A. Taylor
Expert Witness Danielle Mailhoit
November 20, 2012

In the Matter of

Danielle Mailhoit
vs.
Home Depot U.S.A., Inc.
Case No.  CV11-03892-AHM (SSx)

United States District Court
Central District of California

**TABLE OF CONTENTS**

I.    The Nature and Scope of My Work ........................................................................... 1
II.   Qualifications, Prior Case Testimony and Compensation ....................................... 1
III.  Data or Other Information Considered in Forming the Opinions Stated Herein .................. 1
IV.   Analysis ................................................................................................................ 1
V.    Conclusion .......................................................................................................... 4
VI.   Assumptions and Limiting Conditions ................................................................. 4

**Exhibits:**

1.    Summary of Economic Damages
2.    Loss of Earnings and Benefits – Remains Store Manager
3.    Loss of Earnings and Benefits – Promoted to District Manager
4.    Lost Value of Stock Options
5.    Lost Value of Forfeited Restricted Stock

**Appendices:**

A    Resume of Robert A. Taylor
B    Listing of Cases in which Robert A. Taylor has provided testimony for the last four years
C    Listing of Data or Other Information Considered in Forming the Opinions Stated Herein

BRINIG & COMPANY
INCORPORATED

## I.      The Nature and Scope of My Work

I, Robert A. Taylor, have been retained by counsel for Danielle Mailhoit ("Plaintiff") in connection with the matter of Danielle Mailhoit v. Home Depot U.S.A., Inc. ("Home Depot") Case No. CV11-03892-AHM (SSx) in the United States District Court, Central District of California.  This matter arises from the Plaintiff's allegations of gender discrimination and alleged wrongful termination from Home Depot on May 7, 2010.  I have been retained to provide expert witness testimony with respect to economic issues and to render an opinion on the amount of damages incurred by Ms. Mailhoit.  In addition, I have been asked to respond to any expert report presented by the Defendants.

To summarize my opinions and the related bases, I have prepared this report, which has been written to comply with Rule 26 of the Federal Rules of Civil Procedure governing disclosure of expert testimony.  I reserve the right to supplement this report if additional information is provided.

## II.      Qualifications, Prior Case Testimony and Compensation

I am a Certified Public Accountant in the State of California and received my Master of Business Administration with an emphasis in Finance from San Diego State University.  I have qualified as an economic damage expert witness on many occasions in the State of California Superior, United States District and Bankruptcy Courts.  My resume, which more fully describes my professional qualifications and includes a listing of all publications authored by me within the preceding ten years, is attached as Appendix A to this report.  A listing of all cases in which I have given trial or deposition testimony within the preceding four years is attached as Appendix B to this report.

My billing rate is $375 per hour for all work I perform, including trial and deposition testimony.

## III.      Data or Other Information Considered in Forming the Opinions Stated Herein

I have considered several sources of data and other information in forming my opinions.  I have provided a listing of the specific data and other information I considered in forming my opinions at Appendix C to this report.

## IV.      Analysis

Loss of Earnings and Benefits

*Past Loss*

There are two possible scenarios for Ms. Mailhoit's loss of earnings and benefits.  In the first scenario, I have been asked to assume that Ms. Mailhoit would have remained as a store manager at Home Depot but for her termination.  At her date of termination, Ms. Mailhoit was earning an annual salary of $96,700.  I included 2.0% annual increases as of

1

BRINIG & COMPANY
INCORPORATED

May 1, 2011 and May 1, 2012 based on the historical increases in management, professional and related occupations and sales occupations. This resulted in annual earnings of $98,634 as of May 1, 2011 and $100,607 as of May 1, 2012. To these amounts, I added a 50% Management Incentive Plan ("MIP") bonus based on the total 2009 MIP payout Ms. Mailhoit received from Home Depot. I also added a 3.5% 401(K) employer match to the annual salary and MIP amounts. Additionally, I included a 12% restricted stock award based on the historical restricted stock awards Ms. Mailhoit received from Home Depot. I further added a 17% health and welfare benefit based on the total value of health and welfare benefits and other programs available to Ms. Mailhoit as of April 30, 2010. Finally, I added the maximum employer contribution to FICA. This resulted in total past annual earnings and benefits ranging from $184,792 effective May 7, 2010 to $192,195 effective May 1, 2012. The total past loss of earnings and benefits through the date of valuation is $482,913. [See Exhibit 2]

In the second scenario, I have been asked to assume that Ms. Mailhoit should have been promoted to a district manager at Home Depot on either January 1, 2005, 2006, 2007, 2008, 2009 or 2010. I was asked to assume she would have earned an annual salary of $125,000 beginning January 1, 2005 and would have received annual pay increases each May 1st until May 1, 2010, when her annual salary would have been $139,500 based on the average district manager in the Pacific Central and Pacific South regions in 2010. Beginning May 1, 2011 I included 2.0% annual increases every May 1st based on historical increases on the wage indices noted previously. To these amounts, I again added a 50% MIP, a 3.5% 401(K) benefit, a 12% restricted stock award benefit, an 11% health and welfare benefit and the maximum employer contribution to FICA. This resulted in total past earnings and benefits differentials ranging from $65,879 effective January 1, 2005 to $82,913 effective May 1, 2010 and total past annual earnings and benefits ranging from $260,254 effective May 1, 2011 to $265,531 effective May 1, 2012.

If Ms. Mailhoit should have been promoted to a district manager effective January 1, 2005, the total past loss of earnings and benefits through the date of valuation is $866,261. If Ms. Mailhoit should have been promoted to a district manager effective January 1, 2006, the total past loss of earnings and benefits through the date of valuation is $799,715. If Ms. Mailhoit should have been promoted to a district manager effective January 1, 2007, the total past loss of earnings and benefits through the date of valuation is $732,162. If Ms. Mailhoit should have been promoted to a district manager effective January 1, 2008, the total past loss of earnings and benefits through the date of valuation is $663,590. If Ms. Mailhoit should have been promoted to a district manager effective January 1, 2009, the total past loss of earnings and benefits through the date of valuation is $593,984. If Ms. Mailhoit should have been promoted to a district manager effective January 1, 2010, the total past loss of earnings and benefits through the date of valuation is $523,328. [See Exhibit 3]

*Future Loss*

I have been asked to assume that Ms. Mailhoit will experience a wage loss period of

2

either 10 or 20 years. To calculate Ms. Mailhoit's future losses as a store manager, I used total annual earnings and benefits of $192,195. This amount was discounted to present value using a 0.0% net discount rate, which implies that, on average, interest rates will equal wage growth and is based on consideration of the historical wage growth in management, professional and related occupations and sales occupations for the past 10 and 20 years and both current and historical interest rates. This yielded a present value of the loss of future earnings and benefits of $1,921,950 (10 years) and $3,843,900 (20 years). [See Exhibit 2]

To calculate Ms. Mailhoit's future losses as a district manager, I used total annual earnings and benefits of $265,531. This amount was also discounted to present value using a 0.0% net discount rate. This yielded a present value of the loss of future earnings and benefits of $2,655,310 (10 years) and $5,310,620 (20 years). [See Exhibit 3]

Lost Value of Stock Options

At Ms. Mailhoit's date of termination, she had 8,875 non-expired stock options from Home Depot with grant dates between February 22, 2001 and March 23, 2005. I assumed that the stock option grant with the expiration date of February 21, 2011 (2,400 shares) would have expired and not been exercised. I assumed Ms. Mailhoit would have exercised the grant with an expiration date of April 28, 2012 on April 27, 2012 and that she would have exercised the options with an expiration date of August 21, 2012 on that date. This resulted in a value of $5,304 and $26,604 for the two grants which would have expired prior to the date of valuation. As of the date of valuation, Ms. Mailhoit would have had 4,075 non-expired stock options. I calculated the value of these stock options as of the date of valuation using the Black-Scholes model. The total value of the stock options is $119,382. This resulted in a total value of stock options of $151,290. From this amount, I subtracted the value of the two grants exercised by Ms. Mailhoit on May 3, 2010 for $1,908 and $17,440. This assumes Ms. Mailhoit would not have exercised those options on that date but for her termination. The total value of Ms. Mailhoit's lost stock options is $131,942. [See Exhibit 4]

Since Ms. Mailhoit's last stock option was granted March 23, 2005, I assumed Ms. Mailhoit would not have received any additional options in the past or future.

Lost Value of Restricted Stock

At Ms. Mailhoit's date of termination, she had 1,405 non-vested restricted stock shares from Home Depot. These restricted shares were immediately forfeited by Ms. Mailhoit upon her termination. I have valued these shares as of the date of valuation. The total value of Ms. Mailhoit's lost restricted stock shares is $87,279. [See Exhibit 5]

Offset Earnings and Benefits

I have not been asked to address the issue of offset earnings and benefits in my report. If additional information regarding possible offset earnings is provided to me, I will

BRINIG & COMPANY
INCORPORATED

supplement my report.

## V.     Conclusion

In my opinion, based on the data provided to date and the analyses described above, the total present value of the economic loss that Ms. Mailhoit incurred as a result of the alleged wrongful termination which occurred on May 7, 2010 if she had remained a store manager is $2,624,084 (10 year loss) and $4,546,034 (20 year loss).  If Ms. Mailhoit should have been promoted to a district manager and her loss of earnings period is 10 years, the total present value of her economic loss ranges from $3,397,859 to $3,740,792.  If Ms. Mailhoit should have been promoted to a district manager and her loss of earnings period is 20 years, the total present value of her economic loss ranges from $6,053,169 to $6,396,102.  [See Exhibit 1]  The foregoing losses have not been adjusted to provide for possible mitigating earnings, if any.

I will comment as necessary to the report provided by the Defendants' experts.

## VI.    Assumptions and Limiting Conditions

This report is subject to the following assumptions and limiting conditions:

1. This report was prepared for the use of Gregory D. Helmer, Esq. in connection with pending litigation known as Danielle Mailhoit v. Home Depot, U.S.A., Inc.

2. All facts and data as set forth in this report are true and accurate to the best of the author's knowledge and belief.  No matters affecting the conclusions have knowingly been withheld or omitted.

3. The fee charged for this report is not contingent upon the outcome of this matter.

4. The analysis and its conclusions are subject to review upon the presentation of data which may be undisclosed or not available at this writing.

Executed this 20th day of November at San Diego, California.

Robert A. Taylor

4

BRINIG & COMPANY
INCORPORATED

# Exhibit 1

| Date of Valuation: | 1-Dec-12 |
|---|---|
| Date of Birth: | 2-Dec-72 |
| Date of Termination: | 7-May-10 |
| Age at Date of Valuation: | 40.00 |

**Summary of Economic Damages**
**Loss of Earnings and Benefits**
**Remains Store Manager**

| *Loss of Earnings for Additional:* | 10 Years | 20 Years |
|---|---|---|
| **Past** | | |
| Loss of Earnings and Benefits | $    482,913 | $    482,913 |
| | | |
| **Future** | | |
| Loss of Earnings and Benefits | 1,921,950 | 3,843,900 |
| Value of Stock Options | 131,942 | 131,942 |
| Value of Restricted Stock | 87,279 | 87,279 |
| Total Future Loss | 2,141,171 | 4,063,121 |
| **Total Economic Loss** | **$  2,624,084** | **$  4,546,034** |

Note:
 Loss of earnings does not include any possible future offset earnings.

| Date of Valuation: | 1-Dec-12 |
|---|---|
| Date of Birth: | 2-Dec-72 |
| Date of Termination: | 7-May-10 |
| Age at Date of Valuation: | 40.00 |

**Summary of Economic Damages**
**Loss of Earnings and Benefits**
**Promoted to District Manager - Future Loss of Earnings for 10 Years**

| | *Promoted Effective:* | 1-Jan-05 | 1-Jan-06 | 1-Jan-07 | 1-Jan-08 | 1-Jan-09 | 1-Jan-10 |
|---|---|---|---|---|---|---|---|
| **Past** | | | | | | | |
| Loss of Earnings and Benefits | | $ 866,261 | $ 799,715 | $ 732,162 | $ 663,590 | $ 593,984 | $ 523,328 |
| | | | | | | | |
| **Future** | | | | | | | |
| Loss of Earnings and Benefits | | 2,655,310 | 2,655,310 | 2,655,310 | 2,655,310 | 2,655,310 | 2,655,310 |
| Value of Stock Options | | 131,942 | 131,942 | 131,942 | 131,942 | 131,942 | 131,942 |
| Value of Restricted Stock | | 87,279 | 87,279 | 87,279 | 87,279 | 87,279 | 87,279 |
| Total Future Loss | | 2,874,531 | 2,874,531 | 2,874,531 | 2,874,531 | 2,874,531 | 2,874,531 |
| **Total Economic Loss** | | $ 3,740,792 | $ 3,674,246 | $ 3,606,693 | $ 3,538,121 | $ 3,468,515 | $ 3,397,859 |

Note:
  Loss of earnings does not include any possible future offset earnings.

| | |
|---|---|
| Date of Valuation: | 1-Dec-12 |
| Date of Birth: | 2-Dec-72 |
| Date of Termination: | 7-May-10 |
| Age at Date of Valuation: | 40.00 |

**Summary of Economic Damages**
**Loss of Earnings and Benefits**
**Promoted to District Manager - Future Loss of Earnings for 20 Years**

| | *Promoted Effective:* 1-Jan-05 | 1-Jan-06 | 1-Jan-07 | 1-Jan-08 | 1-Jan-09 | 1-Jan-10 |
|---|---|---|---|---|---|---|
| **Past** | | | | | | |
| Loss of Earnings and Benefits | $ 866,261 | $ 799,715 | $ 732,162 | $ 663,590 | $ 593,984 | $ 523,328 |
| **Future** | | | | | | |
| Loss of Earnings and Benefits | 5,310,620 | 5,310,620 | 5,310,620 | 5,310,620 | 5,310,620 | 5,310,620 |
| Value of Stock Options | 131,942 | 131,942 | 131,942 | 131,942 | 131,942 | 131,942 |
| Value of Restricted Stock | 87,279 | 87,279 | 87,279 | 87,279 | 87,279 | 87,279 |
| Total Future Loss | 5,529,841 | 5,529,841 | 5,529,841 | 5,529,841 | 5,529,841 | 5,529,841 |
| **Total Economic Loss** | $ 6,396,102 | $ 6,329,556 | $ 6,262,003 | $ 6,193,431 | $ 6,123,825 | $ 6,053,169 |

Note:
  Loss of earnings does not include any possible future offset earnings.

# Exhibit 2

| Date of Valuation: | 1-Dec-12 |
|---|---|
| Date of Birth: | 2-Dec-72 |
| Date of Termination: | 7-May-10 |
| Age at Date of Valuation: | 40.00 |

## Loss of Earnings and Benefits - Remains Store Manager

Past

| From | To | # of Years | [2] Annual Salary | 50.00% Incentive Bonus | 3.50% 401(K) | 12.00% Restricted Stock | 17.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| 7-May-10 | 30-Apr-11 | 0.98 | 96,700 | 48,350 | 5,077 | 11,604 | 16,439 | 6,622 | 184,792 | 181,096 |
| 1-May-11 | 31-Dec-11 | 0.67 | 98,634 | 49,317 | 5,178 | 11,836 | 16,768 | 6,622 | 188,355 | 126,198 |
| 1-Jan-12 | 30-Apr-12 | 0.33 | 98,634 | 49,317 | 5,178 | 11,836 | 16,768 | 6,826 | 188,559 | 62,224 |
| 1-May-12 | 30-Nov-12 | 0.59 | 100,607 | 50,304 | 5,282 | 12,073 | 17,103 | 6,826 | 192,195 | 113,395 |
| | | 2.57 | | | | | | | [1] | $482,913 |

Future

| | | Loss of Earnings for: | 10 Years | 20 Years |
|---|---|---|---|---|
| Annual Earnings | | [1] | 192,195 | 192,195 |
| # of Years | | | 10.00 | 20.00 |
| Net Discount Rate | | | 0.00% | 0.00% |
| Present Value | | | $ 1,921,950 | $ 3,843,900 |

Note:
Use          2.00% for past increases
                    [2]

Exhibit 3

| | |
|---|---|
| Date of Valuation: | 1-Dec-12 |
| Date of Birth: | 2-Dec-72 |
| Date of Termination: | 7-May-10 |
| Age at Date of Valuation: | 40.00 |

## Loss of Earnings and Benefits - Promoted to District Manager
### Past - Promoted to District Manager January 1, 2005

| | From | To | # of Years | [1],[6] Salary Differential | 50.00% Bonus Differential | 3.50% 401(K) | 12.00% Restricted Stock | 11.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [3] | 1-Jan-05 | 30-Apr-05 | 0.33 | 39,389 | 19,695 | 2,068 | 4,727 | | | 65,879 | 21,740 |
| | 1-May-05 | 30-Apr-06 | 1.00 | 39,985 | 19,993 | 2,099 | 4,798 | | | 66,875 | 66,875 |
| | 1-May-06 | 30-Apr-07 | 1.00 | 40,589 | 20,295 | 2,131 | 4,871 | | | 67,886 | 67,886 |
| | 1-May-07 | 30-Apr-08 | 1.00 | 41,202 | 20,601 | 2,163 | 4,944 | | | 68,910 | 68,910 |
| | 1-May-08 | 30-Apr-09 | 1.00 | 41,823 | 20,912 | 2,196 | 5,019 | | | 69,950 | 69,950 |
| | 1-May-09 | 30-Apr-10 | 1.00 | 42,453 | 21,227 | 2,229 | 5,094 | | | 71,003 | 71,003 |
| | 1-May-10 | 30-Apr-11 | 1.00 | 42,800 | 21,400 | 2,247 | 5,136 | 4,708 | 6,622 | 82,913 | 82,913 |
| | 1-May-11 | 31-Dec-11 | 0.67 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,622 | 260,254 | 174,370 |
| | 1-Jan-12 | 30-Apr-12 | 0.33 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,826 | 260,458 | 85,951 |
| | 1-May-12 | 30-Nov-12 | 0.59 | 145,136 | 72,568 | 7,620 | 17,416 | 15,965 | 6,826 | 265,531 | 156,663 |
| | | | 7.92 | | | | | | | | $ 866,261 |

### Past - Promoted to District Manager January 1, 2006

| | From | To | # of Years | [1],[6] Salary Differential | 50.00% Bonus Differential | 3.50% 401(K) | 12.00% Restricted Stock | 11.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [3] | 1-Jan-06 | 30-Apr-06 | 0.33 | 39,985 | 19,993 | 2,099 | 4,798 | | | 66,875 | 22,069 |
| | 1-May-06 | 30-Apr-07 | 1.00 | 40,589 | 20,295 | 2,131 | 4,871 | | | 67,886 | 67,886 |
| | 1-May-07 | 30-Apr-08 | 1.00 | 41,202 | 20,601 | 2,163 | 4,944 | | | 68,910 | 68,910 |
| | 1-May-08 | 30-Apr-09 | 1.00 | 41,823 | 20,912 | 2,196 | 5,019 | | | 69,950 | 69,950 |
| | 1-May-09 | 30-Apr-10 | 1.00 | 42,453 | 21,227 | 2,229 | 5,094 | | | 71,003 | 71,003 |
| | 1-May-10 | 30-Apr-11 | 1.00 | 42,800 | 21,400 | 2,247 | 5,136 | 4,708 | 6,622 | 82,913 | 82,913 |
| | 1-May-11 | 31-Dec-11 | 0.67 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,622 | 260,254 | 174,370 |
| | 1-Jan-12 | 30-Apr-12 | 0.33 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,826 | 260,458 | 85,951 |
| | 1-May-12 | 30-Nov-12 | 0.59 | 145,136 | 72,568 | 7,620 | 17,416 | 15,965 | 6,826 | 265,531 | 156,663 |
| | | | 6.92 | | | | | | | | $ 799,715 |

### Past - Promoted to District Manager January 1, 2007

| | From | To | # of Years | [1],[6] Salary Differential | 50.00% Bonus Differential | 3.50% 401(K) | 12.00% Restricted Stock | 11.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [3] | 1-Jan-07 | 30-Apr-07 | 0.33 | 40,589 | 20,295 | 2,131 | 4,871 | | | 67,886 | 22,402 |
| | 1-May-07 | 30-Apr-08 | 1.00 | 41,202 | 20,601 | 2,163 | 4,944 | | | 68,910 | 68,910 |
| | 1-May-08 | 30-Apr-09 | 1.00 | 41,823 | 20,912 | 2,196 | 5,019 | | | 69,950 | 69,950 |
| | 1-May-09 | 30-Apr-10 | 1.00 | 42,453 | 21,227 | 2,229 | 5,094 | | | 71,003 | 71,003 |
| | 1-May-10 | 30-Apr-11 | 1.00 | 42,800 | 21,400 | 2,247 | 5,136 | 4,708 | 6,622 | 82,913 | 82,913 |
| | 1-May-11 | 31-Dec-11 | 0.67 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,622 | 260,254 | 174,370 |
| | 1-Jan-12 | 30-Apr-12 | 0.33 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,826 | 260,458 | 85,951 |
| | 1-May-12 | 30-Nov-12 | 0.59 | 145,136 | 72,568 | 7,620 | 17,416 | 15,965 | 6,826 | 265,531 | 156,663 |
| | | | 5.93 | | | | | | | | $ 732,162 |

### Past - Promoted to District Manager January 1, 2008

| | From | To | # of Years | [1],[6] Salary Differential | 50.00% Bonus Differential | 3.50% 401(K) | 12.00% Restricted Stock | 11.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [3] | 1-Jan-08 | 30-Apr-08 | 0.33 | 41,202 | 20,601 | 2,163 | 4,944 | | | 68,910 | 22,740 |
| | 1-May-08 | 30-Apr-09 | 1.00 | 41,823 | 20,912 | 2,196 | 5,019 | | | 69,950 | 69,950 |
| | 1-May-09 | 30-Apr-10 | 1.00 | 42,453 | 21,227 | 2,229 | 5,094 | | | 71,003 | 71,003 |
| | 1-May-10 | 30-Apr-11 | 1.00 | 42,800 | 21,400 | 2,247 | 5,136 | 4,708 | 6,622 | 82,913 | 82,913 |
| | 1-May-11 | 31-Dec-11 | 0.67 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,622 | 260,254 | 174,370 |
| | 1-Jan-12 | 30-Apr-12 | 0.33 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,826 | 260,458 | 85,951 |
| | 1-May-12 | 30-Nov-12 | 0.59 | 145,136 | 72,568 | 7,620 | 17,416 | 15,965 | 6,826 | 265,531 | 156,663 |
| | | | 4.92 | | | | | | | | $ 663,590 |

| Date of Valuation: | 1-Dec-12 |
|---|---|
| Date of Birth: | 2-Dec-72 |
| Date of Termination: | 7-May-10 |
| Age at Date of Valuation: | 40.00 |

## Loss of Earnings and Benefits - Promoted to District Manager

### Past - Promoted to District Manager January 1, 2009

| | From | To | # of Years | [1],[6] Salary Differential | 50.00% Bonus Differential | 3.50% 401(K) | 12.00% Restricted Stock | 11.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [5] | 1-Jan-09 | 30-Apr-09 | 0.33 | 41,823 | 20,912 | 2,196 | 5,019 | | | 69,950 | 23,084 |
| | 1-May 09 | 30-Apr-10 | 1.00 | 42,453 | 21,227 | 2,229 | 5,094 | | | 71,003 | 71,003 |
| | 1-May-10 | 30-Apr-11 | 1.00 | 42,800 | 21,400 | 2,247 | 5,136 | 4,708 | 6,622 | 82,913 | 82,913 |
| | 1-May-11 | 31-Dec-11 | 0.67 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,622 | 260,254 | 174,370 |
| | 1-Jan-12 | 30-Apr-12 | 0.33 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,826 | 260,458 | 85,951 |
| | 1-May-12 | 30-Nov-12 | 0.59 | 145,136 | 72,568 | 7,620 | 17,416 | 15,965 | 6,826 | 265,531 | 156,663 |
| | | | 3.92 | | | | | | | | $  593,984 |

### Past - Promoted to District Manager January 1, 2010

| | From | To | # of Years | [1],[6] Salary Differential | 50.00% Bonus Differential | 3.50% 401(K) | 12.00% Restricted Stock | 11.00% Health & Welfare | FICA | Total Annual Earnings | Period Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| [3] | 1-Jan-10 | 30-Apr-10 | 0.33 | 42,453 | 21,227 | 2,229 | 5,094 | | | 71,003 | 23,431 |
| | 1-May-10 | 30-Apr-11 | 1.00 | 42,800 | 21,400 | 2,247 | 5,136 | 4,708 | 6,622 | 82,913 | 82,913 |
| | 1-May-11 | 31-Dec-11 | 0.67 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,622 | 260,254 | 174,370 |
| | 1-Jan-12 | 30-Apr-12 | 0.33 | 142,290 | 71,145 | 7,470 | 17,075 | 15,652 | 6,826 | 260,458 | 85,951 |
| | 1-May-12 | 30 Nov-12 | 0.59 | 145,136 | 72,568 | 7,620 | 17,416 | 15,965 | 6,826 | 265,531 | 156,663 |
| | | | 2.92 | | | | | | | [2] | $  523,328 |

### Future

| Loss of Earnings for: | | 10 Years | 20 Years |
|---|---|---|---|
| Annual Earnings | [2] | 265,531 | 265,531 |
| # of Years | | 10.00 | 20.00 |
| Net Discount Rate | | 0.00% | 0.00% |
| Present Value | | $  2,655,310 | $  5,310,620 |

Note:
Per attorney, Ms. Mailhoit should have been promoted to a District Manager in the 2005 through 2010 period. Calculate Ms. Mailhoit's loss of earnings assuming she would have been promoted effective 1/1/2005, 2006, 2007, 2008, 2009 and 2010 [3]. She would have had earnings of $125,000 as of 1/1/2005 [4]. Assume annual raises effective each May 1st, resulting in annual salary of $139,500 (the average district manager salary for the Pac Central and Pac South regions) effective 5/1/2010. To calculate loss of additional salary, it is assumed Ms. Mailhoit received annual increases of 2.0% [5] as a district manager. Salary differential calculated as:

| | | [5] Store Manager | District Manager | Salary Differential | 1.85% | Growth |
|---|---|---|---|---|---|---|
| | 1-Jan-05 | 85,611 [4] | 125,000 | 39,389 [1] | | (from 2005-2010) |
| | 1-May-05 | 87,323 | 127,308 | 39,985 [1] | | |
| | 1-May-06 | 89,069 | 129,658 | 40,589 [1] | | |
| | 1-May-07 | 90,850 | 132,052 | 41,202 [1] | | |
| | 1-May-08 | 92,667 | 134,490 | 41,823 [1] | | |
| | 1-May-09 | 94,520 | 136,973 | 42,453 [1] | | |
| | 1-May-10 | 96,700 | 139,500 | 42,800 [1] | | |

Use     2.00% for past increases after Ms. Mailhoit's date of termination.
        [6]

Assume Ms. Mailhoit would have continued to receive restricted stock awards if she had been promoted to a district manager.

No loss of health and welfare and FICA benefits until Ms. Mailhoit was terminated from Home Depot.

# Exhibit 4

**Lost Value of Stock Options**
**Home Depot**

Date of Termination:     7-May-10
Date of Valuation:      1-Dec-12

| Grant Date | Last Day to Exercise | Options Granted | Options Expired | Non-Expired Options | | Value of Stock Options |
|---|---|---|---|---|---|---|
| 12-Feb-99 | 11-Feb-09 | 900 | 900 | - | | - |
| 25-Feb-00 | 24-Feb-10 | 800 | 800 | - | | - |
| 22-Feb-01 | 21-Feb-11 | 2,400 | 2,400 | - | | - |
| 29-Apr-02 | 28-Apr-12 | 1,200 | | 1,200 | [1] | 5,304 |
| 22-Aug-02 | 21-Aug-12 | 1,200 | | 1,200 | [1] | 26,604 |
| 19-Mar-03 | 18-Mar-13 | 1,600 | | 1,600 | | 59,547 |
| 17-Mar-04 | 16-Mar-14 | 1,400 | | 1,400 | | 34,572 |
| 23-Mar-05 | 22-Mar-15 | 1,075 | | 1,075 | | 25,263 |
| | | 10,575 | 4,100 | 6,475 | | $ 151,290 |

Less: Exercised Options      (1,908)
                           (17,440)

                          $ 131,942

Note:
Assumes options with last day to exercise between Ms. Mailhoit's date of termination
and the date of valuation would have expired without having been exercised but for
her termination.  Did not calculate the value of the stock options - conservative.

Value of stock options that would have been exercised calculated as:

| # of Shares | Option Price | Stock Price | Value of Options | |
|---|---|---|---|---|
| 1,200 | 46.96 | 51.38 | 5,304 | [1] |
| 1,200 | 33.86 | 56.03 | 26,604 | [1] |

# Exhibit 5

**Lost Value of Forfeited Restricted Stock**
**Home Depot**

| Restriction Lapse Date | Number of Shares | Stock Price | Value of Shares |
|---|---|---|---|
| 21-Mar-11 | 580 | 62.12 | 36,030 |
| 19-Mar-12 | 208 | 62.12 | 12,921 |
| 25-Mar-11 | 308 | 62.12 | 19,133 |
| 25-Mar-13 | 309 | 62.12 | 19,195 |
| | 1,405 | | $ 87,279 |

# Appendix A

BRINIG & COMPANY
INCORPORATED
VALUATION AND FINANCIAL CONSULTANTS

401 B STREET, SUITE 2150
SAN DIEGO, CA 92101
TEL. (619) 687-2600  FAX (619) 544-0304
www.brinigco.com

ROBERT A. TAYLOR, CPA/ABV
Resume 2012

## EDUCATION AND CERTIFICATION

California State Polytechnic University, Pomona
    Bachelor of Science, Accounting, *cum laude*, 1982
San Diego State University,
    Master of Business Administration, Finance, 1992
Certified Public Accountant – California
Certified Management Accountant
Certified Valuation Analyst

## EXPERIENCE

Auditing and Accounting:  Management of accounting and auditing engagements, including development of audit plan, coordination with clients, supervision of staff, performance of audit tests and preparation of financial statements.  Clients include manufacturing, distribution, real estate construction and health care.

Controllership Experience:  Development of business plans and projections, analysis of financial statements, development and implementation of cost control procedures, supervision of corporate and facility personnel and evaluation of facility personnel.

Management Consulting and Financial and Litigation Analysis:  Preparation of business valuations, financial analysis and damage calculations for numerous types of business, personal injury and wrongful termination matters.  Services include industry research, incremental cost analysis, business projections and deposition and trial testimony.

## MEMBERSHIP IN ASSOCIATIONS

California Society of Certified Public Accountants
American Institute of Certified Public Accountants
Construction Financial Management Association
Institute of Business Appraisers
Institute of Management Accountants
National Association of Certified Valuation Analysts

Resume:  Robert A. Taylor, CPA, ABV, Page 2

## ARTICLES

Taylor, R., *Accounting Terminology in Contracts - Beware of Change*, Trial Bar News, August/September 1993.

Taylor, R., *Factors to Consider When Evaluating Business Interruption Losses*, Trial Bar News, August/September 1992.

Taylor, R. and Salehizadeh, M., *A Test of Purchasing Power Parity for Emerging Economies*.

Taylor, R. with Varaiya, N. and Bergmark, B., *F & C International, Initial Public Offering - A Case Study*.

Taylor, R., *Asserting a Construction Delay Claim*, Building Profits, May/June 1995

## TEACHING

Instructor in Finance for San Diego State University
Instructor in Accounting for the UCSD Extended Studies program
Continuing professional education seminars on financial and accounting theory, business
   valuations and business damages
Guest Lecturer in graduate level seminar class, CPA Consulting, taught by
   Gary Grudnitski, Professor of Accounting, S.D.S.U.

## WORK EXPERIENCE

Principal – Brinig & Company, Inc., November 1, 2010 to present
Partner - Brodshatzer, Wallace, Spoon & Yip, January 1997 to October 31, 2010
Manager - Brodshatzer, Wallace, Spoon & Yip, February 1996 to December 1996
Director - Litigation Services, Coopers & Lybrand LLP, November 1994 to January 1996
Manager - Brodshatzer, Wallace, Spoon & Yip - November 1989 to October 1994
Controller - Health Care Group, April 1987 to November 1989
Supervisor - Steres, Alpert & Carne, July 1985 to April 1987
Senior - KMG/Main Hurdman, May 1984 to July 1985

# Appendix B

ROBERT TAYLOR
DEPOSITION AND TRIAL TESTIMONY

| DEPO/TRIAL | COURT | CASE NAME | DATE | ATTORNEY | P/D | TYPE |
|---|---|---|---|---|---|---|
| BOTH | S.D. SUPERIOR | Garcia v. City of San Diego | 03/2/08 | Dale Hilmen | P | W/D |
| BOTH | S.D. SUPERIOR | David Skyer v. James Parrett | 04/17/08 | MICHAEL NEWLEEE | P | BD |
| TRIAL | S.D. SUPERIOR | W. Hazewinkel v. Ben Hazewinkel | 04/08/08 | Richard Heller | P | Trust |
| BOTH | S.D. SUPERIOR | Kaye Family Trust | 04/22/08 | Boris Siegel | P | Trust Acctg |
| BOTH | S.D. SUPERIOR | Thomas Royden v. Cloud Nine Shuttle | 05/05/08 | GARY SERNAKER | P | PI |
| DEPO | S.D. SUPERIOR | Oceanside Pier View v. SDG&E | 05/13/08 | Jeff Patterson | P | BD |
| BOTH | S.D. SUPERIOR | Quetzal Bilingual v. Timothy Winters | 04/07/09 | Janice Brown | XD | BD |
| BOTH | ARBITRATION | Vido Artukovich and Sons v. Affholder | 09/05/08 | JAMES DRUMMOND | XP | BD |
| BOTH | S.J. SUPERIOR | Zavareh v. Afsahi | 08/21/08 | Clark Davidson | D | BD |
| BOTH | ARBITRATION | Kanj v. Viejas | 08/20/08 | George Howard | D | WT |
| BOTH | S.D. SUPERIOR | CalTrans v. Weik Trucking | 11/13/08 | Rhonda Mallory | P | EM. DOMAINE |
| BOTH | ARBITRATION | Granite Construction v. CalTrans | 10/06/08 | MARK BUDWIG | P | BD |
| DEPO | S.D. SUPERIOR | Food Palace v. Otto Plaza | 10/20/08 | Joe Curd | P | BD |
| DEPO | S.D. SUPERIOR | Lajuj v. Cal Pro Mgmt, et al. | 11/12/08 | Steve Victor | P | PI |
| DEPO | S.D. SUPERIOR | William Burks v. TSC Restoration | 11/20/08 | Matt Butler | P | BD |
| DEPO | New Jersey SUPERIOR | Golden Rings v. Dunkin' Donuts, Inc. | 12/01/08 | ERIC YAFFEE | D/XP | BD |
| BOTH | ARBITRATION | Rohde et al. v. Rebmann et al. | 01/23/09 | Terry Trantina | Claimant | BD |
| DEPO | S.D. SUPERIOR | Avedesian v. Wausau | 12/22/08 | Steven Victor | Claimant | PI |
| DEPO | U.S. District Court | Taylor v. K-Mart | 01/20/09 | Greg Lutz | P | WT |
| DEPO | S.D. SUPERIOR | ActiveRain v. Move Inc. | 01/30/09 | Mike King | D | BD |
| BOTH | ARBITRATION | Giametta v. BakBone | 03/03/09 | Tia Waddell | P | WT |
| BOTH | ARBITRATION | Diamond Dev v. LEM Partners et al. | 04/06/09 | Tom Laube | P/XD | BD |
| BOTH | LA SUPERIOR | Signature Funding II v. TMW Corp. | 07/22/09 | John Walton | D/XP | BD |
| BOTH | RIVERSIDE SUPERIOR | Hawkins v. K-Mart | 07/16/09 | Greg Lutz | P | WT |
| DEPO | S.D. SUPERIOR | Robert Goldstein Family Trust of 1990 | 04/29/09 | Boris Siegel | D/Responden | Trust Acctg |
| TRIAL | RIVERSIDE SUPERIOR | Gomez v. CalTrans | 06/06/09 | Heidi Wierman | D | PI |
| DEPO | S.D. SUPERIOR | Hodgkiss v. TGI Fridays | 07/14/09 | Greg Lutz | P | WT |
| DEPO | S.D. SUPERIOR | Montazella v. TGI Fridays | 07/14/09 | Greg Lutz | P | WT |
| DEPO | LA SUPERIOR | Asia Concepts v. RSI | 06/25/09 | Jeff Patterson | D | BD |
| DEPO | S.D. SUPERIOR | déjà vu v. Michael Galardi et al. | 06/30/09 | John Barriage | D | BD |
| DEPO | County of Monterey SUPERIOR | CalTrans v. Timothy LeNeave | 08/06/09 | Helen Yoon | P | EM. DOMAINE |
| DEPO | ARBITRATION | Schmidt v. Grossmont | 08/31/09 | David Strauss | P | WT |
| DEPO | S.D. SUPERIOR | ? V. Treo | 09/01/09 | Carrie Timko | D | BD |
| DEPO | S.D. SUPERIOR | Adel Somo v. Chevron | 09/23/09 | John Reeves | P | BD |
| DEPO | U.S. District Court | Alloure v. F.A. Cooperative | 10/05/09 | Kevin Adams | P | BD |
| TRIAL | S.D.SUPERIOR | William Pasulka v. Robert Pasulka | 10/22/09 | Ken Lange | P | BD |
| TRIAL | L.A.SUPERIOR | David Vargas v. Rachel Montoya | 10/30/09 | Jeff Smith | P | BD |
| DEPO | U.S. District Court | LaParne v. Monex | 11/04/09 | Laura Schlichtmann | P | Wage/Hour |

APPENDIX B
Page 1

ROBERT TAYLOR
DEPOSITION AND TRIAL TESTIMONY

| Type | Court | Case | Attorney | Date | P/D | Claim |
|---|---|---|---|---|---|---|
| BOTH | ARBITRATION | Clarita v. Gill Family Trust | JAMES STEVENS | 12/15/09 | P | BD |
| DEPO | El Centro SUPERIOR | Loera v. Akal | Matt Butler | 11/11/09 | P | Wage/Hour |
| DEPO | S.D. SUPERIOR | SDUSD v. County of SD | Cyndy Day-Wilson | 01/05/10 | D | BD |
| DEPO | S.D. SUPERIOR | Stiffler v. City of SD | Janice Brown | 01/07/10 | D | WT |
| DEPO | S.D. SUPERIOR | Fred Qin v. MP Creations | Dean Rice | 01/13/10 | D | PI |
| BOTH | LA SUPERIOR | Toby Harris v. Investors Business Daily | Eric Epstein | 03/24/10 | P | Wage/Hour |
| DEPO | LA SUPERIOR | Michael Norris v. Anselmo Soto Garcia et al. | Christopher Thomas | 02/08/10 | D | PI |
| DEPO | S.D. SUPERIOR | Linscott v. Danh | John Rice | 02/09/10 | D | PI |
| DEPO | Santa Ana Superior | Stump v. Collins | Steve Victor | 02/24/10 | P | PI |
| DEPO | S.D. SUPERIOR | JMP v. M. Jimenez | Nathan Arrington | 03/11/10 | P/XD | BD |
| TRIAL | LA SUPERIOR | Liberty National v. Chicago Title | Mike King | 03/24/10 | D | BD |
| TRIAL | S.D. SUPERIOR | Nita Ferreira v. Phil ? | JAMES GRAHAM | 04/05/10 | P | Trust Dispute |
| TRIAL | S.D. SUPERIOR | W. Hazewinkel v. Ben Hazewinkel | Richard Heller | 04/06/10 | D | Trust |
| DEPO | S.D. SUPERIOR | C. Sappenfield v. GNF | Greg Helmer | 04/07/10 | P | Fraudulent Induc |
| BOTH | S.D. SUPERIOR | Richard Fogg v. Orin Green | Jerry Cluff | 06/15/10 | D | BD |
| TRIAL | Santa Ana Superior | Diane Stump v. Brian Collins | C. Brent Scott | 04/19/10 | P | PI |
| DEPO | S.D. SUPERIOR | Zuno v. Ford | Bryan Castro | 04/21/10 | P | Punitive |
| DEPO | S.D. SUPERIOR | Robyn Wanio v | Steven Victor | 04/26/10 | P | PI |
| DEPO | Santa Ana SUPERIOR | Sappenfield v. Novartis | Andrew Friedman | 04/28/10 | P | WT |
| BOTH | S.D. SUPERIOR | Rudy Medina v . John Sarkisian | Ed Chapin | 11/23/10 | P | BD |
| TRIAL | S.D. SUPERIOR | Maria Black et al. v. Moody's | SETH RAFKIN | 05/21/10 | D | Wage/Hour |
| DEPO | S.D. SUPERIOR | MKR Properties v. Lee & Assoc., et al. | James Ballard | 08/04/10 | D | BD |
| DEPO | S.D. SUPERIOR | Hospitality Inc. v. Justin Fitzgerald, et al. | Michael Marchesini | 08/05/10 | D | BD |
| DEPO | Orange County Superior | Miyajima v. Farquhar | Christopher Thomas | 08/17/10 | D | PI |
| DEPO | S.D. SUPERIOR | Zytko et al. v. Evans et al. | William Low | 11/15/10 | R | Trust |
| ARB | ARBITRATION | Millie's Inc. v. American Restaurant Concepts, Inc. | Jeff Patterson | 12/16/10 | P | BD |
| DEPO | San Francisco Superior | Brown v. Intel | Eric Epstein | 01/24/11 | P | Wage/Hour |
| DEPO | San Francisco Superior | PRU/SKS v. CA | SETH RAFKIN | 2/3/2011 | D | BD |
| DEPO | S.D. SUPERIOR | West v. County of San Diego | Joeseph Barr | 02/01/11 | P | PI |
| DEPO | S.D. SUPERIOR | Peniche Disso | Kelly Shaffer | 3/3/2011 | P | Disso |
| TRIAL | San Bernardino Superior | Nikolic v. | Timothy Whiting | 03/07/11 | P | PI |
| ARB | ARBITRATION | Herrick v. Booster Juice | James Mulcahy | 03/11/11 | P | BD |
| DEPO | US District Court - NV | Davis v. Westgate | Leon Greenberg | 04/15/11 | P | Wage/Hour |
| BOTH | San Bernardino Superior | SPS v. HCP | M. RICHARDSON LYNN | 04/20/11 | D | BD |
| DEPO | LA SUPERIOR | Liberty National v. Chicago Title | Mike King | 05/06/11 | P | BD |
| BOTH | LA SUPERIOR | Harris v IBD - Phase 2 | Eric Epstein | 10/19/2011 | P | Wage/Hour |
| Trial | S.D. SUPERIOR | People v. Rinehart | Daniel Shim | 7/7/2011 | P | Criminal |
| TRIAL | S.D. SUPERIOR | Zytko et al. v. Evans et al. | William Low | 8/25/2011 | R | Trust |
| TRIAL | S.D. SUPERIOR | Pasuika Disso | Bob Pasulka | 10/20/11 | R | Disso |
| BOTH | S.D. SUPERIOR | Ramos v. Dillon | Ross Veta | 10/26/11 | D | BD |

APPENDIX B
Page 2

## ROBERT TAYLOR
## DEPOSITION AND TRIAL TESTIMONY

| | | | | | |
|---|---|---|---|---|---|
| BOTH | US District Court | Melbye v. Accelerated | 09/14/12 | P | BD |
| DEPO | S.D. SUPERIOR | Jacobson Family Trust | 11/11/11 | P | Trust |
| DEPO | S.D. SUPERIOR | Marcela Lopez Enriquez v. Alliant University | 12/28/11 | P | WT |
| DEPO | S.D. SUPERIOR | Amy Eischeid v. Reynolds et al. | 12/29/11 | P | PI |
| BOTH | S.D. SUPERIOR | Suky Smith v. Ken Cornell | 04/12/12 | P | BD |
| ARB | ARBITRATION | Neill v. Booster Juice | 3/2012 | D | BD |
| BOTH | S.D. SUPERIOR | Allen Rivers v. Vinturi | 04/11/12 | P | BD |
| DEPO | S.D. SUPERIOR | Lewter v Thomas | 03/08/12 | P | WD |
| DEPO | S.D. SUPERIOR | Thomas Martinez v. Mad Engine | 02/09/12 | P | BD |
| DEPO | S.D. SUPERIOR | Angelica v. Emerald et al. | 03/12/12 | D | BD |
| TRIAL | S.D. SUPERIOR | Rudy Medina v. John Sarkisian | 08/22/12 | P | BD |
| BOTH | S.D. SUPERIOR | Smith v. B&B Acoustics | 08/22/12 | P | BD |
| BOTH | ARBITRATION | Vandenberg Housing v Meyer Architechture | 09/27/12 | P | BD |
| DEPO | L.A. SUPERIOR | Kin Hui v. Charles Dunn | 10/02/12 | P | BD |
| DEPO | US District Court | Stonebreaker v. Guardian | 10/12/12 | P | BD |
| BOTH | S.D. SUPERIOR | Galvan v. Smeardyk | 11/19/12 | P | PI |
| DEPO | Imperial County SUPERIOR | Travelers v. Everest | 10/31/12 | D | BD |
| DEPO | S.D. SUPERIOR | Rosenzweig v. Bernheim | 11/05/12 | P | BD |
| DEPO | S.D. SUPERIOR | Dully v Kreft | 11/20/12 | P | PI |

APPENDIX B
Page 3

# Appendix C

**Documents Reviewed in Danielle Mailhoit v. Home Depot U.S.A., Inc.**

1.  Transcript of the deposition of Danielle Tillman taken October 17, 2012 with exhibits;

2.  Order;

3.  Stipulated Protective Order;

4.  2010 Individual Performance Review Summary for Danielle D. Mailhoit, Store Manager;

5.  Your Total Value Statement for Danielle D. Mailhoit as of September 30, 2009;

6.  Your Total Value Statement for Danielle D. Mailhoit as of April 30, 2010;

7.  Home Depot Participant Statement detailing option balances and restricted share balances for Danielle Mailhoit as of January 14, 2010;

8.  The Home Depot Cashless Sell of a Non-Qualified Stock Option for Danielle D. Mailhoit granted August 22, 2002 and exercised May 3, 2010;

9.  The Home Depot Cashless Sell of a Non-Qualified Stock Option for Danielle D. Mailhoit granted March 19, 2003 and exercised May 3, 2010;

10. The Home Depot, Inc. Restricted Stock Award dated March 19, 2008 to "Associate";

11. The Home Depot, Inc. Restricted Stock Award dated March 25, 2009 to "Associate";

12. The Home Depot, Inc. Restricted Stock Award dated March 24, 2010 to "Associate";

13. The Home Depot, Inc. 2005 Omnibus Stock Incentive Plan Summary March 2012;

14. 2008 Total Reward Procedures and Guidelines for Non-Officer Salaried Associates;

15. 2011 Benefits Summary for U.S. Salaried and Full-Time Hourly Associates;

16. Vacation Benefits -- Salaries Associates revision 8.02.11 effective February 10, 2011;

17. Time-Off Benefits-US revision 1.11.11 effective December 1, 2011;

18. Time-Off Benefits-US revision 2.02.12 effective March 19, 2012;

19. Time-Off Benefits-US revision 3.03.12 effective March 19, 2012;

20. Time-Off Benefits-US revision 4.03.12 effective March 19, 2012;

21. Home Depot Legal Notices regarding health benefits;

22. Excerpt from The Home Depot, Inc. Form 10-K for the fiscal year ended January 29, 2012;

23. Historical stock prices for The Home Depot, Inc. (HD) from finance.yahoo.com;

24. *Wall Street Journal*, November 14, 2012, regarding interest rates on Treasury instruments;

25. Various data regarding wage growth and various interest rates.

# EXHIBIT 2

1

1         UNITED STATES DISTRICT COURT
2      FOR THE CENTRAL DISTRICT OF CALIFORNIA
3              WESTERN DIVISION
4
5   DANIELLE MAILHOIT,                    )
                                          )
6           Plaintiff,                    )
                                          )
7       vs.                               ) Case No.
                                          ) CV11-03892-DOC
8   HOME DEPOST U.S.A., INC., a           ) (SSx)
    corporation, THE HOME DEPOT,          )
9   U.S.A., INC., a corporation,          )
    and DOES 2 through 50,                )
10  inclusive,                            )
                                          )
11          Defendants.                   )
    _____)
12
13
14
15
16
17      VIDEOTAPED DEPOSITION OF:  ROBERT TAYLOR
18
19      WEDNESDAY, DECEMBER 12, 2012, 10:20 A.M.
20            LOS ANGELES, CALIFORNIA
21
22
23
24  REPORTED BY:
    VALERIE E. RASMUSSEN
25  CSR 8900

2

1    UNITED STATES DISTRICT COURT

2              FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                        WESTERN DIVISION

4

5        DANIELLE MAILHOIT,                    )
                                               )
6                   Plaintiff,                 )
                                               )
7           vs.                                )  Case No.
                                               )  CV11-03892-DOC
8        HOME DEPOST U.S.A., INC., a           )  (SSx)
         corporation, THE HOME DEPOT,          )
9        U.S.A., INC., a corporation,          )
         and DOES 2 through 50,                )
10       inclusive,                            )
                                               )
11                  Defendants.                )
         _____    )

12

13

14

15           The videotaped deposition of ROBERT TAYLOR, taken

16    on behalf of Defendants, before Valerie E. Rasmussen,

17    Certified Shorthand Reporter 8900 for the State of

18    California, commencing at 10:20 a.m., WEDNESDAY, DECEMBER

19    12, 2012, at the LAW OFFICES OF OGLETREE, DEAKINS, NASH,

20    SMOAK & STEWART, P.C., 400 South Hope Street, Suite 1200,

21    Los Angeles, California.

22

23

24

25

3

1    APPEARANCES OF COUNSEL:

2

3        FOR THE DEFENDANTS:

4            LAW OFFICES OF OGLETREE, DEAKINS, NASH, SMOAK &
             STEWART, P.C.

5            BY:  ELIZABETH A. FALCONE
             Attorney at Law

6            400 South Hope Street, Suite 1200
             Los Angeles, California  90071

7            (213) 239-9800

8

        FOR THE PLAINTIFF:

9

             LAW OFFICE OF HELMER FRIEDMAN, LLP

10           BY:  GREGORY D. HELMER
             Attorney at Law

11           8522 National Boulevard, Suite 107
             Culver City, California  90232

12           (310) 396-7714

13

        ALSO PRESENT:

14

             Jeannie Schwarze, Dean Jones Video Services

15

16

17

18

19

20

21

22

23

24

25

```
                                                          4
 1                         I N D E X
      WITNESS NAME                                 PAGE
 2

      ROBERT TAYLOR
 3
          EXAMINATION BY MS. FALCONE ..................... 6
 4
 5                       E X H I B I T S
 6    NUMBER       DESCRIPTION                      PAGE
 7    239          List of deposition and trial testimony   20
                   from Robert Taylor
 8
      240          Resume                          58
 9
      241          Retainer Agreement              76
10
      242          Report of Robert Taylor in the Danielle  81
11                 Mailhoit / Home Depot matter
12    243          Amended exhibits with prime designations 89
                   on them
13
      244          Handwritten document entitled "Average   121
14                 dm Salary/MIP/equity, with E2 at the
                   bottom
15
      245          A list of documents and data provided to 132
16                 Robert Taylor
17    246          Cashless Sale of a Nonqualified Stock     150
                   Option, Client-Entered, Unsolicited
18
      247          Historical Home Depot stock prices       162
19                 downloaded from Finance.Yahoo.com
20    248          Home Depot document entitled "Value       170
                   Statement"
21
      249          Deposition digest - Document O from       197
22                 Robert Taylor's workfile
23    250          E-mail string dated April 4 and April 5,  199
                   2012
24
25
```

5

1          WEDNESDAY, DECEMBER 12, 2012, 10:20 A.M.

2

3

4      THE VIDEOGRAPHER:  Good morning.  This is the

5  videotape deposition of Robert A. Taylor, taken at 400

6  South Hope Street, Suite 1200, Los Angeles, California, on

7  Wednesday, December 12, 2012, in the matter of Danielle

8  Mailhoit versus Home Depot USA, Inc.  Case No.

9  CV11-03892-DOC (SSX), U.S. District Court, Central

10  District of California, Western Division.

11          This deposition is on behalf of the defendant.

12          My name is Jeannie Schwarze with Dean Jones

13  Attorney Video Services of Los Angeles and Santa Ana,

14  California.  This deposition is commencing at 10:20 a.m.

15          Would all present please identify themselves,

16  beginning with the deponent.

17      THE WITNESS:  I'm Robert Allen Taylor, expert witness

18  on behalf of Danielle Mailhoit.

19      MR. HELMER:  Gregory Helmer of Helmer Friedman on

20  behalf of Danielle Mailhoit.

21      MS. FALCONE:  Elizabeth Falcone with Ogletree Deakins

22  on behalf of Home Depot, USA, Inc.

23  ///

24  ///

25  ///

6

1          ROBERT TAYLOR,

2   was called as a witness by and on behalf of Defendants

3   Home Depot U.S.A., Inc., and having been first duly sworn

4   by the Certified Shorthand Reporter, was examined and

5   testified as follows:

6

7          EXAMINATION

8

9   BY MS. FALCONE:

10      Q    Good morning, Mr. Taylor.

11      A    Good morning.

12      Q    We met briefly.  My name is Elizabeth Falcone.

13  I'm one of the attorneys for Home Depot in this case.  I'm

14  going to be taking your deposition today.  You stated your

15  name earlier was Robert Allen Taylor.  Have you ever been

16  known by any other name?

17      A    No.

18      Q    Okay.  And typically I would give a lay witness a

19  series of admonitions about how a deposition proceeds and

20  what the ground rules are.  However, I understand you've

21  had your deposition taken many times before; correct?

22      A    Yes.

23      Q    Okay.  So if I dispatch with those or just run

24  through them very quickly, will that be sufficient for

25  you?

42

1   define the term "malingering," but the sense that I have

2   when it's raised out there is that someone is -- is not

3   attempting to properly mitigate.  And that's the sense.

4   I'm not giving you a legal definition, if there is such a

5   legal definition.

6   BY MS. FALCONE:

7       Q    I'm not asking you for a legal definition.

8       A    Okay.  That's my sense of what the term would

9   mean.

10      Q    Right.  Okay.  And so you describe that you

11  didn't provide any offsets for Mr. Hawkins' damages given

12  his age.  Did I understand you correctly before?

13      A    Yes.

14           And just to clarify, I don't believe I was asked

15  to opine as to whether or not Mr. Hawkins was able to

16  obtain alternate employment.  That was the

17  position -- that was the assumption that I was given, I

18  didn't deal with mitigation.

19      Q    I understand that.  If you could stick with my

20  questions, that would be great.

21           What I'm asking you is, in that particular case,

22  you did not offset your damages' calculations with other

23  employment; correct?

24      MR. HELMER:  Asked and answered.

25      THE WITNESS:  I believe that's -- that's correct.

43

1        I -- now that I think about the case, I believe

2    there may have been a short period of time where he

3    obtained alternate employment for a -- again, for a very

4    brief period of time; it didn't work out.  That would have

5    been a factor and a subtraction in my calculation.

6            But in terms of imputing earnings or calculating

7    other possible mitigation, I did not.

8    BY MS. FALCONE:

9        Q    Okay.

10       A    Your statement is correct.

11       Q    Are there cases in which you do calculate other

12   possible future earnings and offset the damages

13   calculations that you prepare?

14       MR. HELMER:  Vague.

15       THE WITNESS:  There are cases when I will have a -- a

16   damage calculation, whether, again, plaintiff or defense;

17   and a vocational-evaluation person, or expert, will

18   provide me with either assumed offset employment, or I'll

19   see what the person is doing, and that will be

20   subtraction.

21   BY MS. FALCONE:

22       Q    Right.  And is it your understanding that that's

23   something that is appropriate to do, which is subtract

24   offset for possible future earnings?

25       MR. HELMER:  Vague.  Argumentative.  Lack of

44

1    foundation.

2         THE WITNESS:  It depends on the -- the circumstances.

3    That's the best I can do, to answer your question.

4    BY MS. FALCONE:

5         Q     What does it depend on?

6         A     I would assume that it depends on the situation

7    of the individual who is either injured in the accident or

8    terminated, and what their personal -- what their

9    situation is.  I typically don't end up giving vocational

10   or job-placement opinions.  I will accept assumptions or

11   the opinions of other --

12        Q     Okay.

13        A     -- others.

14        Q     So is what you're telling me that whether you

15   offset the damages or not, depends on whether the attorney

16   provides -- asks you to do that, and provides you with an

17   estimate from a vocational expert about possible future

18   earnings?

19        A     That would generally be a fair statement; that's

20   correct.  And then even -- even then, sometimes there can

21   be an assumption regarding an offset.

22        Q     Okay.  Out of the cases in which you are valuing

23   lost earnings, what percentage of those cases would you

24   say you do offset the future damages by potential earnings

25   in the future?

93

1    benefits that Ms. Mailhoit would have received, had she

2    remained employed at Home Depot.

3        Q    Right.  Ex- -- the report is simply a projection

4    of what she would have earned had she continued to be

5    employed under a couple of different scenarios; correct?

6        A    Yes.

7        Q    The report does not include -- strike that.

8             The report -- your report has absolutely no

9    offset for Ms. Mailhoit's potential earnings if she gains

10   subsequent employment; is that right?

11       A    Yes.

12       Q    Okay.  And typically an offset for potential

13   earnings is something you would expect to see in an

14   economic-loss report; correct?

15       MR. HELMER:  Objection.  Lack of foundation.

16       THE WITNESS:  It depends.

17   BY MS. FALCONE:

18       Q    What does it depend on?

19       A    It depends on the circumstances of the case.

20       Q    And by that do you mean what the attorneys tell

21   you to do, or some other circumstance?

22       A    It -- it can depend on the situation that the

23   individual finds -- in which the individual finds himself

24   or herself; but typically I don't make any opinions

25   regarding that.  And in this case, I've been provided no

94

1    information, nor have I been asked to make an assessment

2    of -- of mitigation earnings.

3        Q    Okay.  Do you know if Ms. Mailhoit is currently

4    employed?

5        A    I -- my impression is that she is not, but I am

6    not positive.

7        Q    Did you inquire about that?

8        MR. HELMER:  Outside the scope of the expert's case.

9        THE WITNESS:  I do not know Ms. Mailhoit's current

10   employment status.

11   BY MS. FALCONE:

12       Q    I'm asking if you --

13       A    Oh.

14       Q    -- inquired about it.

15       A    I personally don't recall talking to Mr. Helmer

16   or Mr. Friedman about that.

17       Q    Okay.  Do you have any reason to believe that

18   Ms. Mailhoit is incapable of working?

19       MR. HELMER:  Outside the scope of the expert's

20   assigned task and opinion.

21       THE WITNESS:  I have no opinion.

22   BY MS. FALCONE:

23       Q    Have you ever been given any information to

24   suggest that Ms. Mailhoit is incapable of working?

25       MR. HELMER:  Same objection.

95

1       THE WITNESS:  I don't recall receiving information

2   regarding that one way or the other.

3   BY MS. FALCONE:

4       Q    I don't think you're answering my question.

5            Have you ever been given information that

6   suggests Ms. Mailhoit's incapable of working?  Yes or no?

7       MR. HELMER:  Same objections.  Asked and answered.

8       THE WITNESS:  I don't believe so.

9   BY MS. FALCONE:

10      Q    You did not take into account any mitigation

11  earnings that Ms. Mailhoit possibly could earn; is that

12  true?

13      MR. HELMER:  Beyond scope of expert assigned.

14      THE WITNESS:  There are no subtractions in my

15  calculation for possible mitigation earnings, if any.

16  BY MS. FALCONE:

17      Q    Okay.  All the report does is project

18  Ms. Mailhoit's potential earning stream at Home Depot

19  given various assumptions the attorneys gave you; correct?

20      A    Yes.

21      Q    Um --

22      A    Wait a minute.  And given various assumptions.

23           Yes, as it relates to the assumptions regarding

24  the potential promotion to district manager.

25           But certainly the calculations are based on Home

96

1    Depot documents and incentive plans and other information.

2         But the assumptions regarding the dates for

3    promotion and the time periods were provided by

4    Ms. Mailhoit's counsel.

5         Q    Okay.  Did you ever ask for any facts or data

6    that you wanted to consider in order to form your opinion

7    that was not provided to you?

8         A    I don't believe so.

9         Q    You were asked to make two different scenarios --

10   strike that.

11        You were asked to assume that Ms. Mailhoit would

12   have been promoted as of January 2005, 2006, 2007, 2008,

13   2009, 2010; correct?

14        A    Yes.

15        Q    Were you ever provided with any documents or data

16   corroborating the reasonableness of that assumption?

17        MR. HELMER:  Calls for a legal conclusion.

18        THE WITNESS:  I don't know.  And the reason I answer

19   it that way is, I've been provided a lot of documents in

20   the case.  Ultimately, those dates were assumptions, so I

21   didn't go through and attempt to corroborate an

22   assumption.

23   BY MS. FALCONE:

24        Q    You said you've been provided a lot of documents

25   in the case.  You were provided the majority of the

181

1    Q    Okay.  And this is the number, total economic

2    loss, at the bottom, two thous- -- $2,624,084 assumes that

3    Ms. Mailhoit has no future earnings from the time she was

4    fired in May 2010 up through what date?

5    A    Up through December 1st, 2022.

6    Q    Do you have any opinion about whether it's

7    reasonable to assume that Ms. Mailhoit would not have any

8    earnings between May of 2010 and December of 2022?

9    A    No.

10   Q    Okay.  And when you say 2022, that's for -- isn't

11   that for the 4-million figure?

12   A    No, that would be for the $2,624,000 number.

13   It's 10 years from --

14   Q    It's 2012, right.

15   A    It's fine.  Exactly.

16   Q    I'm aging myself.

17        Okay.  Let me re-ask my question, just

18   so -- okay, actually, I don't need to re-ask the question,

19   because you clarified it.

20        Okay.  And for the 20-year figure, that would

21   assume that Ms. Mailhoit has no earnings between May 7,

22   2010, and December 1st, 2023; right?

23   A    2032 --

24   Q    I'm sorry.

25   A    -- because it's 20 years, but -- that's okay,

182

1    don't worry.

2              And the -- I think the words are a little bit

3    off.

4              This is a calculation of the -- the present value

5    of the earnings and benefits that Ms. Mailhoit would have

6    had, had she continued at Home Depot.  I'm really not

7    offering an opinion regarding possible offset earnings.

8    If there is a -- a determination that there should be

9    offset earnings, that would be mitigation that would be a

10   subtraction.

11             This is simply looking at the value of the

12   earnings and benefits for Ms. Mailhoit had she been

13   employed at Home Depot for -- Home Depot for either 10 or

14   20 years.

15        Q    Right.  And I understand that.

16        A    Okay.

17        Q    And I'm just confirming, you don't have an

18   opinion as to whether it's reasonable for Ms. Mailhoit to

19   have no future offset earnings between May 7, 2010, and

20   December 1st, 2032?

21        A    I have no opinion regarding that.

22        Q    Okay.

23        MR. HELMER:  It's beyond the scope.

24   BY MS. FALCONE:

25        Q    And you are not offering here any opinion on what

183

1    her possible future offset earnings might be between

2    May 7, 2010, and December 1st, 2022; correct?

3        A    I have not prepared any calculations regarding

4    possible offset earnings.

5            However, as I indicated earlier in the

6    deposition, I will consider your expert's report and any

7    information he or she may have and provide in their

8    report.  If your expert has a calculation related to

9    offset earnings, I will certainly consider what is

10   included in your expert's report.

11       Q    Okay.  You also don't include any calculation for

12   possible future offset earnings between May 7, 2010, and

13   December 1st, 2032; correct?

14       A    Your statement is correct.

15       Q    Okay.  If we go to the next page of this

16   Exhibit 2 -- I'm sorry, Exhibit 1, that is a chart that

17   was affected by the changes; correct?

18       A    Yes.

19       Q    Okay.  And so we should replace that with A1

20   prime; right?

21       A    Yes.

22       Q    Okay.  And if I go to the next page of Exhibit 1,

23   that chart also is affected by the changes in the date

24   calculations; right?

25       A    Yes.

203

1    BY MS. FALCONE:

2        Q    Do you agree with the statement that a plaintiff

3    has an obligation to make reasonable efforts to find

4    comparable employment?

5        MR. HELMER:  Lack of foundation.  Argumentative.

6        THE WITNESS:  I don't -- I have no opinion regarding

7    that.  I mean, I think you're getting into some legal

8    areas and I'm not going to be giving legal opinion.  You

9    could ask me to assume that someone should do a certain

10   thing and they could earn a certain amount, that's doable.

11   But I have no opinion regarding the efforts that should be

12   made in this case.

13       MR. HELMER:  Calls for a legal conclusion.

14   BY MS. FALCONE:

15       Q    Were you ever asked to assume that Ms. Mailhoit

16   had made a deliberate decision to withdraw from the labor

17   market for any reason?

18       A    Was I -- could you read that back or just say it

19   again?

20       Q    Were you ever asked to assume that Ms. Mailhoit

21   had made a deliberate decision to withdraw from the labor

22   market?

23       A    I have made no assumption one way or the other

24   regarding Ms. Mailhoit's decisions relative to that labor

25   market.

204

1      MR. HELMER:  Beyond the scope.

2  BY MS. FALCONE:

3      Q    Well, you assume that she's incurring losses from

4  not working; correct?

5      A    I was -- I've --

6      MR. HELMER:  Lack of foundation.  Argumentative.

7      THE WITNESS:  I think what we've said is that I've

8  calculated the present value of the earnings and benefits

9  that Ms. Mailhoit would have received, at least in my

10  opinion, for a 10-year and a 20-year period, had she not

11  been terminated from Home Depot.

12          I have not evaluated possible future offset

13  earnings, if any, that would be relevant in this matter.

14  I think that's the -- that's the terminology I would --

15  that's the way I would like to put it.  That's what I've

16  tried to convey throughout the deposition.

17  BY MS. FALCONE:

18      Q    Yeah, I understand what you're trying to convey.

19  But when I asked you earlier if it was an economic loss

20  report, you -- you seemed to say that it was.  And now

21  you're saying that it's just an assumption of what she

22  would have made had she remained employed; there's no

23  assumptions about whether she's in the labor market or

24  not.

25      MR. HELMER:  Mischaracterizes his testimony.

205

1    Argumentative.  Lacks foundation.

2          Is that a question?

3      MS. FALCONE:  If you had let me finish, there would

4    have been one.

5      Q    Is it an ac- --

6      MR. HELMER:  Seemed like you were finished.

7      MS. FALCONE:  Can you let me finish?

8      MR. HELMER:  If indeed you are not finished, please

9    continue.

10   BY MS. FALCONE:

11     Q    Is it an economic loss report or is it simply a

12   projection of what would have been made at Home Depot?

13     A    If you assume that -- that there are going to be

14   no future offset earnings, then it's an economic loss

15   report.

16     Q    But if you assume that there are going to be

17   future economic earnings, then it's not an economic loss

18   report?

19     A    Then there would have to be -- then if you assume

20   that there should be mitigation, or some additional --

21   some offset earnings in the future, that would need to be

22   a subtraction from the calculations which I have prepared.

23     Q    Have you ever been asked in an employment-related

24   case to assume that a person was -- had withdrawn

25   themselves from the labor pool, meaning, they weren't

206

1    looking for work, they didn't want to work, they couldn't

2    work; for some reason, there's no wage lost during the

3    period of time?

4         MR. HELMER:  Lack of foundation.  Beyond the scope.

5         THE WITNESS:  I'm not sure what you just asked.  Could

6    you try it again?

7    BY MS. FALCONE:

8         Q    Yeah.  Have you ever been asked to assume for a

9    particular individual, that for a period of time they

10   weren't part of the job -- the labor market, meaning, they

11   just, you know -- for what -- they took a sabbatical and

12   traveled around the world, or -- or they had a child and

13   decided not to work for two years so they -- they couldn't

14   seek wage loss for a period of time?  Something like that,

15   where they just took themselves out of the job market so

16   you couldn't add up dollars for that period of time?

17        A    I believe that a cal- -- that there have been

18   times when I have -- when there have been periods during

19   which there was no calculation for a loss because somebody

20   was -- would -- would not be in the labor market.

21             I believe -- in a reverse scenario of that, from

22   time to time, when I'm working for the defense, if the

23   defense contends that there is a failure to mitigate, then

24   there would be a vocational evaluation or job-placement

25   person who will ask me to assume a certain position or

207

1   level of income should have been attained.

2        Q    Okay.  I'm focusing on periods of just, you know,

3   not working.  Were you asked to make any assumptions like

4   that about Ms. Mailhoit, that there was a period of time

5   where she could not be working or chose not to be working?

6        A    No.  Now I understand your question.  It just

7   took a minute to get there.

8        Q    It's okay.  I don't always explain things

9   perfectly, I'm sure.

10       You have no opinion in this case about whether

11  Ms. Mailhoit has done an appropriate job search; correct?

12       A    Your statement is correct.

13       Q    Other than what we've already gone over today,

14  are there any other opinions that you intend to offer at

15  trial, other than potential rebuttal opinions?

16       MR. HELMER:  Asked and answered.

17       THE WITNESS:  I don't believe so.

18  BY MS. FALCONE:

19       Q    Okay.  Are there any other facts that support

20  your opinions in this case that you haven't already

21  related or discussed with me today?

22       A    I cannot imagine that there could be.  That was

23  actually a compliment, by the way.  You've done a very --

24  I think you've explored this very well.

25       Q    All right.  Well, I appreciate that.

208

1      Okay.  Have I given you an opportunity to fully

2  answer all of my questions?

3      A    Yes.

4      Q    Okay.

5      MS. FALCONE:  I don't have any further questions for

6  the witness.

7      MR. HELMER:  Why don't we go off the record for one

8  minute, but I doubt I do.

9      THE VIDEOGRAPHER:  Off record, 3:38 p.m.

10         (Recess taken.)

11     THE VIDEOGRAPHER:  Returning to record, 3:41 p.m.

12     MS. FALCONE:  We are going to have the same

13  stipulation that we've had before, which is that the

14  original of the transcript -- with a few changes -- the

15  original of the transcript can be sent directly to

16  Mr. Taylor's office.  From his date of receipt --

17  actually, from the date of the transmittal letter, is how

18  I've been doing it, he'll have 30 days to review and sign

19  it.  Then he needs to send it back to my office.

20     If for whatever reason Mr. Taylor destroys the

21  deposition, or it's lost, destroyed by someone else,

22  whatever may happen to the deposition, that a certified

23  copy can be used for any and all purposes, trial, motion

24  practice, whatever.

25     If you don't make any changes within 30 days of the

209

1    date of the transmittal letter, it's waived.

2        THE WITNESS:  Okay.

3        MR. HELMER:  So stipulated.

4        MS. FALCONE:  Thank you.

5        THE VIDEOGRAPHER:  Videotape deposition of Robert A.

6    Taylor is being concluded at 3:42 p.m.

7            This concludes Tape 4 of 4.  Thank you.

8            (Declaration under penalty of perjury attached

9    hereto.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

210

```
1                        * * *
2          I certify, under penalty of perjury under the
3     laws of the United States of America, that the foregoing
4     is true and correct.
5
6     Executed at_____ on_____, 20__.
                   (Place)                (Date)
7
8
                       _____
9                           ROBERT A. TAYLOR
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

211

```
 1    STATE OF CALIFORNIA      )

 2                             )  SS.

 3    COUNTY OF ORANGE         )

 4

 5            I, VALERIE E. RASMUSSEN, Certified Shorthand

 6    Reporter, Certificate No. 8900, for the State of

 7    California, hereby certify:

 8            I am the deposition officer that stenographically

 9    recorded the testimony in the foregoing deposition;

10            Prior to being examined, the deponent was by me

11    first duly sworn;

12            The foregoing transcript is a true record of the

13    testimony given.

14            Before completion of the deposition, review of

15    the transcript [ XXXXX  ] was    [     ] was not

16    requested.  If requested, any changes made by the

17    deponent (and provided to the reporter) during the period

18    allowed are appended hereto.

19

20    Dated: December 21, 2012

21

22

                              _____

23                            VALERIE E. RASMUSSEN

                                 CSR NO. 8900

24

25
```